**MEDART, INC., Appellant,**

v.

**Richard G. AUSTIN, Administrator, General Services Administration, Appellee.**

No. 91–1338.

United States Court of Appeals, Federal Circuit.

June 24, 1992.

Lester F. Smith and Robert L. McArty, Perry, Morrison & Smith, Jackson, Miss., argued, for appellant.

Catherine A. Christman, Atty., Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued, for appellee. With her on the brief were Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director and Martha H. DeGraff, Asst. Director. Also on the brief was Steven M. Stomski, Asst. General Counsel, Personal Property Div., General Services Admin., of counsel.

Before NIES, Chief Judge, MAYER and PLAGER, Circuit Judges.

MAYER, Circuit Judge.

Medart, Inc. appeals the decision of the General Services Administration Board of Contract Appeals, 91–2 B.C.A. (CCH) ¶ 23,-741, 1991 WL 15456 (1991), rejecting its demand for reimbursement of losses incurred in the performance of a requirements contract because of variance between actual orders and the government's estimated requirements. We affirm.

*Background*

The underlying facts are essentially undisputed. On January 30, 1985, the General Services Administration (GSA) issued a solicitation for bids on a requirements contract to supply gray metal storage and wardrobe cabinets to several hundred federal ordering agencies, including military activities having between 100 and 300 ordering locations throughout the world. The solicitation specified a contract period from September 1, 1985, to August 31, 1986, with an option to renew for one additional year. It set out six line items, each one broken down into three delivery zones. The contract was to be awarded on an item-by-item and zone-by-zone basis.

Estimated requirement quantities for each line item in each zone were included in the solicitation. Beginning on November 21, 1984, the estimates were prepared at the contracting officer's request to GSA's inventory management branch. The GSA supervisory inventory management specialist provided information on the number of units ordered by zone during the previous fiscal year from October 1983 to September 1984, the most current twelve month period available. GSA's procurement officials used no other method to determine the estimated quantities for the solicitation, and they did not adjust estimates to reflect significant discrepancies between earlier estimates for the contract items and actual orders.

On March 4, 1985, Medart submitted bids on five of the six line items in each of the three delivery zones. The contracting officer determined that Medart was low bidder on three of the five items in all zones and, on May 2, 1985, awarded the contract on those items. On June 12, 1985, the contracting officer also accepted Medart's bid on a fourth line item in all zones.

Over the course of contract performance, the actual orders for the pertinent line items deviated significantly from the government estimates in the solicitation:

| Stock Number | Total Estimated Contract Quantity | Actual Quantity Ordered | Variance |
|---|---|---|---|
| 8534 | 8,950 | 6,720 | (25%) |
| 9217 | 12,290 | 4,180 | (66%) |
| 5434 | 3,940 | 3,005 | (24%) |
| 6224 | 6,625 | 2,017 | (70%) |

Therefore, Medart filed a claim with the contracting officer alleging that "we have suffered devastating losses as a result of excessive freight and manufacturing costs which have resulted from a drastic imbalance in the mix of actual orders received compared to the estimated quantities provided in the original solicitation for bids."

The contracting officer denied the claim, stating, "The fact that the quantities ordered for the items awarded differed from the good faith estimates set forth in the original solicitation is not considered a com-

pensable change, since all the Government is obligated to do is order its actual requirements." On appeal, the board upheld the decision of the contracting officer.

### Discussion

■ A requirements contract calls for the government to fill all its actual requirements for specified supplies or services during the contract period by purchasing from the awardee, who agrees to provide them at the agreed price. 48 C.F.R. § 16.-503(a) (1991); *see Shader Contractors, Inc. v. United States*, 276 F.2d 1, 4, 149 Ct.Cl. 535 (1960). This arrangement is useful when the government anticipates recurring needs but cannot predetermine the precise quantities or future demands at the time of the award. 48 C.F.R. §§ 16.501(a), 16.-503(b) (1991). The very nature and use of a requirements contract presupposes uncertainty about actual purchases.

■ Under the Federal Acquisition Regulations the contracting officer must furnish estimated quantities in a solicitation contemplating a requirements contract:

For the information of offerors and contractors, the contracting officer shall state a realistic estimated total quantity in the solicitation and resulting contract. This estimate is not a representation to an offeror or contractor that the estimated quantity will be required or ordered, or that conditions affecting requirements will be stable or normal. The contracting officer may obtain the estimate from records of previous requirements and consumption, or by other means, and should base the estimate on the most current information available.

*Id.* § 16.503(a)(1). The express terms of this regulation make clear that the risks associated with variance between actual purchases and estimated quantities are allocated to the contractor. Accordingly, estimated quantities are "not guarantees or warranties of quantity." *Shader*, 276 F.2d at 7. The Medart contract explicitly reiterates this allocation:

The quantities shown herein as estimated requirements are based upon information made available to the General Services Administration. Since, however, such estimates are being furnished to the bidder solely for general informational purposes, no guarantee is given that any quantities will be purchased, but assurance is accorded that such bona fide needs as may arise will be obtained subject to any provisions elsewhere set forth in this contract.

■ Therefore, because actual purchases vary significantly from government estimates does not ordinarily give rise to liability on the part of the government. *See Clearwater Forest Indus., Inc. v. United States*, 650 F.2d 233, 240, 227 Ct.Cl. 386 (1981); *see also Womack v. United States*, 389 F.2d 793, 802, 182 Ct.Cl. 399 (1968). On the other hand, presumably contractors rely on the proffered estimates in formulating their bids, so the government must act in good faith and use reasonable care in computing its estimated needs; it is not free to carelessly guess at its needs. Where a contractor can show by preponderant evidence that estimates were "inadequately or negligently prepared, not in good faith, or grossly or unreasonably inadequate at the time the estimate was made[,]" the government could be liable for appropriate damages resulting. *Clearwater Forest*, 650 F.2d at 239. Medart's suggestion that when actual orders vary significantly from estimates the burden of persuasion should shift to the government to prove the reasonableness of its estimating procedure is not well taken.

Medart argues that taking last year's orders as next year's estimated needs is simply an unreasonable procedure. It contends that in determining reasonable estimates, GSA should have, among other things, contacted or polled end-users about their projected needs and budgets, considered the use of statistical formulas such as regression analysis, used more than one year's ordering history, and checked the effectiveness of its estimating procedure based on past performance. Each of these, and many other approaches, might have improved the accuracy of the government estimates, but their mere existence does

not mean the approach selected was not reasonable.

■ The controlling regulation explicitly states that "[t]he contracting officer may obtain the estimate from records of previous requirements and consumption, or by other means, and should base the estimate on the most current information available." 48 C.F.R. § 16.503(a)(1) (1991). This is precisely how the contracting officer formulated the estimates in this case. Medart says that if "other means" produce more realistic estimates than "records of previous requirements and consumption," then "other means" should be used. For example, Medart suggests that GSA should have polled end-users about their projected needs and budgets. But the scope of this contract was extensive; it was used to supply cabinets to several hundred ordering agencies, including hundreds of military sites throughout the world. The board found that there was no central point to obtain accurate predictions of orders by ordering agencies. The government used information that was reasonably available; it need not search for or create additional information. *See Womack*, 389 F.2d at 801; *accord Chemical Technology, Inc. v. United States*, 645 F.2d 934, 946, 227 Ct.Cl. 120 (1981).

The government *may* go beyond the requirements of the regulations, of course. And it might be well advised to do so if it wants to secure the best prices and avoid contractors raising their bids to cover the uncertainties. But we are in no position to impose such a requirement either in this case or as a general proposition in the face of the regulations promulgated by competent authority. The regulations explicitly say that estimates may be based on the most current information about previous requirements available; Medart knew this, as well as who bore the risks of variances in quantity. It should have factored the risks into its bid, *see Shader*, 276 F.2d at 7, just as the regulation was factored into the contract.

Medart's other arguments are equally without merit.

### Conclusion

Accordingly, the decision of the General Services Administration Board of Contract Appeals is affirmed.

AFFIRMED.