SERVICE TECHNICIANS,
INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 94–647C.

United States Court of Federal Claims.

Feb. 25, 1997.

Ivor F. Thomas, Carlsbad, California, for plaintiff.

Thomas O. Mason, with whom were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and Kirk T. Manhardt, Assistant Director, Civil Division, United States Department of Justice, Washington, DC, for defendant. Charles E. Chambers, Naval Facilities Engineering Command, San Diego, California, of counsel.

## OPINION

MARGOLIS, Judge.

This case, which involves plaintiff's claim for compensation based on a constructive change to a government contract, is currently before the Court on defendant's motion for summary judgment. Defendant argues that plaintiff's claim is barred by the doctrine of collateral estoppel because the Armed Services Board of Contract Appeals has already determined, in connection with a similar claim by plaintiff, that there was no constructive change to the contract. Alternatively, defendant argues that summary judgment is appropriate because there are no disputed issues of material fact and, as a matter of law, there was no constructive change to the contract. After considering the arguments presented by both parties in the briefs and at oral argument, the Court concludes that the contract was not constructively changed, and therefore summary judgment is granted for the defendant. ·

## FACTS

This case involves a contract between plaintiff, Services Technicians, Inc. ("STI"), and defendant, the United States, acting through the Department of the Navy, for the performance of housing maintenance services at the Marine Corps Air Station in Tustin, California. The Naval Facilities Engineering Command in San Diego, California published a solicitation for the contract at issue on July

11, 1988. The solicitation invited interested contractors to submit bids for a proposed maintenance services contract for fiscal year 1989 ("FY89" or "base period"), a one-year period which began on October 1, 1988 and ended on September 30, 1989. The solicitation also requested that interested contractors submit bids for three additional one-year option periods.

The proposed contract called for the performance of a wide variety of housing maintenance services. For purposes of bidding, the work under the contract was divided into two major portions—a firm fixed price ("FFP") portion, and an indefinite quantities ("IQ") portion. In responding to the solicitation, interested contractors were required to submit a separate bid for each category of work, for each year of performance. The work at issue in this case—referred to by the parties as "service calls"—fell within the FFP portion of the contract. Interested contractors were required to submit a "lump sum" bid for the FFP portion of the contract; this lump sum bid represented the compensation the contractor would receive for performing *all* maintenance work—including all service calls—that was set forth in Section C of the contract.

The solicitation did not specify the actual number or the annual rate of service calls that the contractor would be required to perform under the proposed contract. Instead, the solicitation informed potential bidders that the contractor would be required to perform as many service calls, along with the other work specified in the FFP portion of the contract, as required by individual residents of the Air Station. In particular, the following language from the solicitation indicated that the contractor would be responsible for performing service calls in whatever quantities the Navy required during the performance period:

> FIRM FIXED PRICE LUMP SUM WORK: Price for labor and materials to perform work in the BASE PERIOD for all work specified in Section C except for work specifically included in the Indefinite Quantity portions of this contract.

Def.'s Motion for Summary Judgment, App. at 87. The solicitation contained similar language for each of the three option years. *Id.* at 89–93.

To assist interested parties in formulating their bids, the Navy provided historical data, in Attachment J–10–1 to the solicitation, showing the actual number of service calls that had been performed at the Tustin Air Station during the previous five fiscal years. The solicitation also indicated the number of occupied dwellings at the Tustin Air Station during the previous five years. Finally, the solicitation informed potential bidders that the Navy tentatively planned to construct 100 additional housing units at the Tustin Air Station during 1989, and another 100 housing units during 1990.

Using the information supplied by the Navy in the solicitation, including the historical data provided in Attachment J–10–1, STI submitted a bid for the Tustin Air Station contract. As required by the solicitation, STI's submission to the Navy included separate bid prices for the FFP and IQ portions of the contract. The Navy awarded the contract to STI on September 19, 1988. STI's performance for the base period began on October 1, 1988, and ended on September 30, 1989. At the end of the base period, the Navy exercised each of the three one-year option periods. In addition, STI and the Navy entered into a supplemental agreement on September 30, 1992, whereby the parties agreed to extend the contract for three months, with three additional option periods of one month. Again, the Navy exercised each of the one-month option periods. Thus, STI's performance under the contract—including the base year, the option years, and all extensions—ran from October 1, 1988 until March 31, 1993, a period of 54 months.

The present dispute arose after STI had completed its performance under the contract. On December 15, 1993, STI submitted a certified claim to the Navy's contracting officer ("CO") requesting compensation for "completion of excessive service calls." In its claim, STI argued that the historical data provided by the Navy in Attachment J–10–1 to the solicitation established that, over the five years preceding the award of the contract, the housing units on Tustin Air Station required an annual average of 3.57 service

calls per occupied dwelling per year. In support of this figure, STI provided the CO with an analysis of the historical data that had been provided by the Navy in Attachment J–10–1 to the solicitation, presented in terms of calls per dwelling.[1]

| Year | # Units | # Service Calls | Calls/Dwelling |
|---|---|---|---|
| FY'83 | 649 | 1680 | 2.59 |
| FY'84 | 861 | 3577 | 4.15 |
| FY'85 | 991 | 3324 | 3.35 |
| FY'86 | 991 | 3622 | 3.65 |
| FY'87 | 1255 | 5161 | 4.11 |

STI also provided the CO with an analysis of the actual number of service calls performed by STI over the entire 54 month life of the contract.[2] This analysis showed that STI performed the following number of service calls, at the following annual rates, over the entire life of the contract.

| Year | # Units | # Service Calls | Calls/Dwelling |
|---|---|---|---|
| Base Year (FY'89) | 1255 | 5573 | 4.44 |
| Option 1 (FY'90) | 1355 | 6288 | 4.64 |
| Option 2 (FY'91) | 1537 | 6789 | 4.42 |
| Option 3 (FY'92) | 1537 | 7674 | 4.99 |
| Extension Period | 1537 | 7798 3 | 5.07 |

STI then compared the actual annual rate of calls per dwelling allegedly performed over the life of the contract, with the annual rate of calls per dwelling allegedly established by the historical data. According to STI, the annual rate of calls per dwelling actually performed by STI exceeded the rate established by the historical data by 24.4% in the Base Period; 30% in Option Year One; 23.8% in Option Year Two; 39.7% in Option Year Three; and 25% in the Extension Period. STI argued in its claim to the CO that it was entitled to additional compensation for these additional service calls. The CO rejected STI's claim, and this action followed.

## DISCUSSION

Defendant has moved for summary judgment in this case, arguing, among other things, that the contract was not construc- tively changed. This Court may enter summary judgment in cases where there are no genuine issues of material fact such that the moving party is entitled to judgment as a matter of law. RCFC 56; see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed.Cir.1987). In order to prevail on a motion for summary judgment, "[t]he moving party has the burden of showing the absence of a genuine issue of material fact." C. Sanchez & Son, Inc. v. United States, 6 F.3d 1539, 1541 (Fed.Cir.1993). "A genuine issue of material fact arises when the nonmovant presents sufficient evidence upon which a reasonable factfinder, drawing the requisite inferences and applying the applicable evidentiary standard, could decide the issue in favor of the nonmovant." Id. The nonmovant, however, "may not rest upon general denials in its pleadings or otherwise, but must proffer countering evidence sufficient to create a genuine factual dispute." Sweats Fashions, Inc. v. Pannill Knitting Co., Inc., 833 F.2d 1560, 1562 (Fed.Cir.1987). Based on the evidence presented by both parties, the Court finds that there are no genuine issues of material fact, and defendant is entitled to a judgment as a matter of law.

### 1. Constructive Change

▮ The controlling issue in this case, according to plaintiff, is "whether or not STI should be compensated for the service calls [STI] performed which exceeded the number of service calls set forth in the historical data included in the solicitation." Pl.'s Response at 3. According to plaintiff, STI "was required by the Navy to perform a number of

---

1. Attachment J–10–1 showed only the number of service calls performed per month during 1982–87. The data in Attachment J–10–1 was not presented in terms of service calls per dwelling. However, STI argues that its analysis, presented in terms of calls per dwelling, takes into account the fluctuation of occupied dwellings between FY '83–FY '87 and produces an annual average of 3.57 completed service calls per dwelling.

2. Plaintiff's counsel indicated at oral argument that some of the service calls included in these figures should not be included in plaintiff's claim because STI was compensated for some service calls as the result of certain bilateral modifications of the contract. Defendant's counsel conceded, however, that plaintiff's figures are substantially correct, and therefore the Court accepts plaintiff's figures for purposes of deciding defendant's summary judgment motion.

3. This figure is an annualized figure, which was apparently calculated by doubling the actual number of service calls (3899) allegedly performed by STI during the six-month extension.

service calls during the performance period ... which was substantially in excess of the number of service calls represented on Attachment J–10–1 to the solicitation," that is in excess of 3.57 calls per dwelling per year. Complaint at 3. Consequently, plaintiff is seeking compensation for the number of service calls performed by STI that exceeded the annual rate of 3.57 calls per dwelling allegedly established by the historical data, on the theory that the Navy constructively changed the contract by requiring STI to perform these excess or additional service calls.

In order to establish a constructive change to a government contract, plaintiff must establish two elements. As explained in *Miller Elevator Co., Inc. v. United States,*

> A constructive change entails two base components, the change component and the order or fault component. The "change" component describes work outside of the scope of the contract, while the "order/fault" component describes the reason that the contractor performed the work. Thus, if the Government either expressly or impliedly ordered work outside the scope of the contract, or if the Government otherwise caused the contractor to incur additional work, a constructive change arises for the work performed outside of the scope of the contract.

*Miller Elevator Co. v. U.S.,* 30 Fed.Cl. 662, 678 (1994) (citations omitted).

After reviewing the arguments and evidence submitted by both parties in this case, the Court finds that plaintiff has failed to present any evidence which would permit the Court to conclude that STI performed any work that was outside the scope of the contract. Specifically, plaintiff cannot show that STI performed additional work—either an additional type of work, or an additional quantity of work—that would constitute a constructive change. As the government correctly points out, STI specifically agreed, in Section C of the contract, to perform the particular type of work at issue in this case—namely, service calls. Furthermore, STI specifically agreed to perform whatever quantity of service calls the Navy required during the life of the contract. The solicita-

tion, which later became the contract, contained the following language concerning the quantity of service calls to be performed:

> FIRM FIXED PRICE LUMP SUM WORK: Price for labor and materials to perform work in the BASE PERIOD for all work specified in Section C except for work specifically included in the Indefinite Quantity portions of this contract.

Under the plain terms of the contract, then, STI agreed to accept a lump sum payment to perform *all* service calls required by Navy personnel at Tustin Air Station, in whatever quantities required.

Despite the language in the solicitation and the contract which specified that STI would perform an indefinite quantity of service calls, STI now argues that the contract required the contractor to perform 3.57 service calls per dwelling per year. According to plaintiff, this rate was established by the historical data that the Navy provided in Attachment J–10–1 to the solicitation. Based on the evidence presented, however, the Court holds that the Tustin Air Station contract in no way guaranteed or required that STI would perform service calls at an annual rate of 3.57 calls per dwelling, as plaintiff contends.

Indeed, plaintiff has admitted that the increase in the actual number of service calls performed by STI, and the supposed increase in the annual rate of calls, was actually anticipated by STI. In a letter to the contracting officer dated November 18, 1992, STI noted the increasing number of service calls performed by STI during the first three years of the contract, but attributed that increase to the expected rise in the number of occupied housing units at Tustin Air Station. STI pointed out in its 1992 letter that the rate of increase in service calls—22% over three years—was exactly proportional to the increase in occupied units—also 22% over three years. Given this direct proportionality, STI indicated that the "previous workload increases were anticipated." Def.'s Motion for Summary Judgment, App. at 66. This statement, which was made by STI's president contemporaneously with STI's performance of the contract, directly contradicts plaintiff's present contention that STI was

required to perform service calls at a greater rate than it anticipated at the time the parties entered into the contract. By plaintiff's own admission, then, the number of service calls performed by STI did not represent additional work, *i.e.*, did not fall outside the scope of work agreed to by the parties at the time they entered into the contract.[4]

### 2. *Faulty Estimate*

 At best, STI might be able to show that the historical data was provided as an estimate of the Navy's requirements during the life of the contract.[5] Even if this raw data was to be viewed as an estimate, however, plaintiff would not be entitled to recover damages simply because the number of service calls actually performed exceeded the number reflected in the historical data. So long as the government acts in good faith in promulgating an estimate, "the mere fact that there is a significant variance between the estimates of work set forth in the contract and the actual work encountered in performance does not necessarily give rise to liability on the part of the government for the inaccurate estimates set forth in the contract." *Crown Laundry & Dry Cleaners, Inc. v. United States,* 29 Fed.Cl. 506, 519 (1993); *see also Medart, Inc. v. Austin,* 967 F.2d 579, 581 (Fed.Cir.1992) ("[B]ecause actual purchases vary significantly from government estimates does not ordinarily give rise to liability on the part of the government.") (citing *Clearwater Forest Indus., Inc. v. United States,* 227 Ct.Cl. 386, 650 F.2d 233, 240 (1981); *Womack v. United States,* 182 Ct.Cl. 399, 389 F.2d 793, 802 (1968)).

To recover damages from the Navy for a faulty estimate, plaintiff must "show by preponderant evidence that estimates it relied on were negligently prepared or were unreasonably inadequate, indicating a lack of due care in their preparation at the time the estimates were made." *Crown Laundry,* 29 Fed.Cl. at 520; *see also Chemical Technology, Inc. v. United States,* 227 Ct.Cl. 120, 645 F.2d 934, 945–47 (1981) (contract was constructively changed, entitling contractor to an equitable adjustment, where government estimate did not take into account all information reasonably available to it and thereby "misled or in any event did not adequately inform bidders on this contract as to the scope of the contract they were bidding on"); *Womack,* 389 F.2d at 801 ("[I]n promulgating an estimate for bidding-invitation purposes, the Government is not required to be clairvoyant but it is obliged to base that estimate on all relevant information that is reasonably available to it.")

In this case, STI has not presented any evidence to suggest that the Navy acted negligently or unreasonably in collecting or compiling the data for inclusion in the solicitation. Similarly, plaintiff has not presented any evidence to suggest that the historical data provided by the Navy in Attachment J–10–1 was inaccurate or misleading. To the contrary, plaintiff's counsel conceded at oral argument that the historical data was accurate and not misleading. As plaintiff's counsel noted during oral argument, the Navy gathered the historical data directly from the previous contractor's reports, which are public records. Furthermore, plaintiff's counsel conceded at oral argument that the historical data was not unreasonably inadequate. The Court therefore concludes that there is no evidence from which this Court could find the government liable to plaintiff for providing a faulty estimate. In formulating its bid, STI

---

4. STI's November 18, 1992 letter to the contracting officer did claim, however, that STI was entitled to an equitable adjustment for performing an excessive number of service calls during the fourth year of the contract. Nevertheless, STI did not claim that the historical data provided in the solicitation led STI to believe that it would be required to perform service calls at an annual rate of 3.57 calls per dwelling, the crux of plaintiff's present claim.

5. The Court does not mean to imply, however, that the Navy estimated that the contractor would be required to perform service calls at an annual rate of 3.57 calls per dwelling, as plaintiff contends. The annual rate of 3.57 calls per dwelling allegedly established by the historical data is the result of STI's interpretation of raw historical data that was supplied by the Navy in Attachment J–10–1. The record before this Court clearly shows that the Navy never interpreted the data, *i.e.*, never represented to potential bidders that the contractor would be required (a) to perform a definite number of service calls, or (b) to perform service calls at a definite annual rate.

bore the risk that the amount of its lump sum bid for the FFP portion of the contract was sufficient to cover STI's cost of performing an indefinite number of service calls. Absent evidence that the Navy acted negligently or unreasonably in promulgating the historical data from which STI estimated the Navy's needs, STI cannot be permitted to now shift the risk back to the government because the actual number of service calls performed by STI exceeded STI's bidding estimate.

## CONCLUSION

For the reasons set forth above, the Court finds that the contract was not constructively changed. In view of this holding, the Court need not decide whether plaintiff's claim is barred under the doctrine of collateral estoppel. Therefore, defendant's motion for summary judgment is granted. The clerk shall dismiss the complaint. Costs for defendant.